UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver of Tennessee Commerce Bank, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:12-1241 |
| | ) | Judge Sharp |
| DAVID S. MYERS, | ) ) | |
| Defendant. | ) | |

### MEMORANDUM

This is an action to collect on a note brought by Plaintiff, the Federal Deposit Insurance Corporation as receiver of Tennessee Commerce Bank ("FDIC-R"), against Defendant David S. Myers. The parties have filed Cross-Motions for Summary Judgment (Docket Nos. 41 & 52), and those Motions have been fully briefed.[1] Defendant has also requested oral argument (Docket Nos. 47 & 80), and filed a motion to exclude or disregard portions of an affidavit (Docket No. 68) submitted by the FDIC-R

### I. Background

On November 30, 2009, Defendant executed a Promissory Note ("Note") that provided:

For value received, David S. Myers ("Maker"), promises to pay to the order of Citizens Corporation, a Tennessee corporation ("Payee"; Payee and any subsequent holder[s] hereof are hereinafter referred to collectively as "Holder") the principal sum of FIVE MILLION EIGHT HUNDRED SEVENTY FIVE THOUSAND DOLLARS AND NO/100 ($5,875,000) with interest thereon from the date hereof at a floating rate of interest equal to the New York Prime Lending Rate plus 1.00%

---

[1] Plaintiff's Motion is styled as one for summary judgment or judgment on the pleadings. Since the Court must look beyond the pleadings to address issues raised by Defendant, it treats Plaintiff's Motion as one for summary judgment.

1

(one percent) per annum with a minimum rate of interest of 5.75% per annum with the rate to change on the same day as the New York Prime Lending Rate is changed.

(Docket No. 1-1, Note at 1). The Note further provided:

If Maker shall fail to pay any installment of the indebtedness evidenced hereby within ten (10) days of the date the same is due, then Holder may, in addition to any other remedy available to it at law or in equity, accelerate the indebtedness.

(Id.). It also provided:

Interest only on the outstanding principal balance hereof shall be due and payable semi-annually, in arrears, beginning on May 1, 2010 and continuing on the first day of each November and May until May 1, 2012 when in addition to the accrued interest a principal payment of $145,000.00 will also be due with said payments of principal plus interest being due on the first day of each following November and May until May 1, 2015 at which time said principal payment shall increase to $295,000.00 and be due in addition to the accrued interest on the first day of each following November and May until May 1, 2020 at which time said principal payments shall increase to $514,000.00 and be due in addition to the accrued interest on the first day of each following November and May until November 1, 2021, upon which date the entire outstanding balance of principal and unpaid interest thereon shall be due and payable in full (the "Maturity Date"). The interest accruing on the unpaid principal balance shall be computed based upon a 365 day year, and shall be calculated daily on the basis of the actual number of days elapsed. Maker may prepay all or any part of this Promissory Note without penalty.

(Id.).

Plaintiff claims that, by virtue of a Participation Certificate executed the same day, TCB funded $5,300,000.00 of the Note in exchange for receiving a participation interest of such amount in the Note. Plaintiff also claims that North Alabama Bank funded the remaining amount of $575,000.00 and received a participation interest for said amount.

As the language of the Note itself makes clear, the original payee of the Note was Citizens Corporation ("Citizens"). However, on August 11, 2011, Citizens executed a Transfer, Assignment and Assumption Agreement ("Transfer Agreement") as well as an allonge which referenced the Note.

Paragraph 2 of the Transfer Agreement states that Citizens "transfers, assigns and conveys" to TCB "all of Assignor's right, title and interest in, to and under the Loans, Notes and Loan Documents, including, without limitation, all Administrative Agent Rights under the Participation Certificates or otherwise, and any and all interests of Assignor in any of the collateral and/or security provided for the Loans (collectively, the 'Assigned Interests and Documents')." (Docket No. 1-4, Transfer Agreement at 1). The next two paragraphs provide:

> 3. In order to induce Assignee to accept the transfer and assignment of the Assigned Interests and Documents, Assignor hereby covenants with, represents and warrants to, Assignee as follows:
>
>> (a) Assignor has all requisite authority to execute and deliver this Agreement and to deliver the Assigned Interests and Documents to Assignee; and
>>
>> (b) Except for this Agreement and any participations in the Loans evidenced by participation certificates to lenders other than Assignee . . . , Seller is the sole owner of the Assigned Interests and Documents and Seller has not sold, pledged, mortgaged, hypothecated, encumbered, assigned or transferred or granted a security interest in any of the Loans or any portion thereof or interest therein, to any other party.
>
> 4. Assignee hereby assumes all of Assignor's right, title, and interest in and to the Assigned Interests and Documents, including without limitation, the immediate right to collect the Loans and pursue enforcement of the Loan Documents, all as may be done in Assignee's sole discretion.

(Id. at 2).

On January 27, 2012 the Tennessee Department of Financial Institutions closed TCB and the FDIC-R was appointed as receiver. At the time of the closure, the Note was in the possession of TCB.

On October 16, 2012, counsel for the FDIC-R sent a Notice of Default to Defendant, advising him of the default on the Note and demanding payment in full. Defendant made no

3

payments to Plaintiff in response to the Notice of Default. In fact, he has never paid anything toward the principal amount of $5,875,000.00.

Based on these facts, Plaintiff filed suit in this Court alleging breach of contract and unjust enrichment, and now moves for judgment on both claims. In response, Defendant does not dispute most of the foregoing facts. Rather, he opposes summary on the breach of contract claim arguing that "the Note never became an asset of TCB; the FDIC is neither a holder of the Note nor a transferee; the note was not delivered to TCB with the intent to give it the right to enforce the note; the Note is not endorsed to TCB; the 'allonge' that the FDIC claims as a valid endorsement is not effective; and the 'Assignment' asserted by the FDIC as transferring all rights to TCB was not effective." (Docket No. 41 at 1-2). The unjust enrichment claim fails, he insists, because "it is well-established law that a participant's only contractual relationship is with the lender from which it purchased the participations and a participant has no ability to seek legal recourse against the borrower." (Id. at 2). In support of those arguments and his own Motion for Summary Judgment, Defendant offers additional facts, including the following.

Defendant claims he was induced into signing the Note by Marion E. Lowery. Lowery had a controlling interest in Citizens (which provided data processing and other "backroom" services to community banks via a subsidiary), as well as controlling interest in holding companies that owned community banks – Farmers Bank of Lynchburg ("Farmers") and Commerce Bancshares, Inc. ("CBI"), the holding company for Peoples State Bank of Commerce ("Peoples"). Citizens and Lowery were major borrowers from TCB which sometimes sold participation in the loans to community banks.

In mid-2009, Lowery and TCB were searching for means by which value could be realized

4

from the stocks of Peoples and Farmers so that TCB could ultimately secure most, if not all, of its outstanding loans to Citizens and Lowery. With the help of outside advisors, Lowery devised a plan calling for the merger of Peoples and Farmers, and the raising of substantial new capital by the resulting bank. The first step in this process would be the infusion of approximately $10 million into companies controlled by Lowery. To raise that money, Lowery and TCB agreed to approach the minority stockholders of Citizens (and other employees of Lowery-controlled entities) and ask them to purchase additional stock in Citizens, CBI or Farmers with the assurance that Citizen would agree to loan each 100% of the cost of the stock.

Defendant was a minority shareholder of Citizens who had a business relationship with Lowery. In 2005, Lowery invited Defendant to invest $500,000.00 to acquire an interest in Union Federal, LLC, which was later folded into Citizens, making Defendant a shareholder of the latter. Thereafter, and on several occasions, Lowery told Defendant about additional blocks of stock that were available for purchase, and encouraged him to take additional positions. As inducement, Lowery offered to have Citizens loan Defendant 100% of the purchase price; assured him that the dividends paid by the holding companies would be sufficient to cover any debt service on the loans; and promised that if he wanted out of an investment, arrangements would be made for the repurchase of stock.

Over the years, Defendant accepted a number of such offers and signed notes payable to Citizens. The results were favorable: prior to 2011 Defendant was never asked to pay any material amount of money for debt service on any of the outstanding notes because the dividends or other distributions proved sufficient. On the one occasion when Defendant asked that CBI repurchase stock, Lowery made sure that happened.

5

It allegedly was against this backdrop that Defendant was approached by Lowery in November 2009. Five others were also approached[2] who, collectively, would sign notes totaling almost $21 million.

Defendant was asked to commit $575,000.00, to purchase additional shares of Citizens, and more than $1.5 million to purchase 48,000 shares in Farmers.[3] At this time it was represented to him the value of his stock (and the to be acquired stocks in Citizens, CBI and Farmers) was $8,747,538.00, meaning that only 67% of his stocks would be pledged as securities for the $5.875 million note he agreed to sign. However, Defendant claims he did not know that Citizens did not have the liquidity to fund the loans it was proposing to make to him and the other Minority Shareholders, nor that Citizens had secured commitments from TCB and North Alabama Bank to purchase participations equal to 100% of the face amount of his new note. Instead, and trusting Lowery, Defendant agreed to the transaction.

Closing occurred on November 30, 2009, on documents prepared by Citizens, including the Note in the principal amount of $5.875 million and a Pledge and Security Agreement that (with one minor exception) encumbered all stock then held by Defendant in Citizens, Farmers, and CBI.[4] Proceeds from the note were used to retire a previous $3.6 million note, to pay Lowery more than

---

[2] Among them was Dr. James Ashmore. He, too, was sued by the FDIC-R in this Court in a case handled by Judge Nixon who entered an Order granting the FDIC-R's Motion for Summary Judgment. FDIC-R v. Ashmore, Case No. 3:13-00519, Docket No. 64 (M.D. Tenn. Oct. 21, 2015). That decision will be referenced herein as "Ashmore, Slip. op. at ___."

[3] Defendant claims that, two years into the 2008 financial collapse, he did not want to own more stock in Citizens, CBI or Farmers, but wanted to join his fellow shareholders in what seemed a workable plan to provide temporary financial accommodation to enable these companies to weather the recession and return to financial health, and do so in a way that would not require additional cash from his pocket.

[4] Closings for the five other minority shareholders occurred on that same day. The forms of the notes, pledge agreements and related documents signed by all the minority shareholders are substantially identical.

$1.5 million for the 48,000 shares of Farmers stock, and to credit Citizens with $575,000 for Defendant's new shares of Citizens' stock. As Defendant puts it, he "did not walk away from the 'closing' with as much as one additional penny of cash in his pocket." (Docket No. 45 at 7).[5]

Defendant claims that, on or around May 1, 2011, he learned that Citizens had sold participations amounting to 100% of the face amount of his Note, and that Citizens did not have funds to pay its participants their shares of the May 1, 2011 interest installment. He also learned that Citizens had borrowed large amounts from TCB, and that Lowery had personally borrowed more than $10 million from TCB secured by stock in Citizens, Farmers and/or CBI.

Defendant contends Lowery told him not to worry about the May 1 interest installment because he (Lowery) and Citizen were negotiating with TCB for a debt-previously-contracted transaction ("DPC") pursuant to which TCB would take ownership of all of the stock in Farmers and CBI that had been pledged, and credit the appraised values thereof against the respective loans. TCB, in turn, would allow Citizens to use the cash flows from Fi-Data (another of Lowery's interest) to service any remaining loan balances.

On August 12, 2011, Lowery met with Tommy Crocker at TCB and signed a Letter of Intent ("LOI") relating to the DPC. He also signed other documents, including a Transfer, Assignment and Assumption Agreement, which stated that, within ten days, Citizens would transfer its remaining interests as holder and servicing agent of the minority shareholder loans, and deliver possession of and endorse the notes evidencing said loans.[6]

---

[5] According to Defendant, Citizen and Lowery fared much better because the funds advanced by TCB enabled them to service the loans and keep them in a performing status.

[6] The Assignment was expressly made subject to the participations held by North Alabama Bank in several of the loans.

The LOI had signature blocks for each of the Minority Shareholders, but none of them had been invited to attend the August 12, 2011 meeting between Lowery and Crocker. Defendant claims Crocker told Lowery that he would contact each of the minority shareholders to get their signatures on the LOI and other necessary documents before Lowery returned from a planned out-of-state trip. That, however, never occurred.

On September 9, 2011, TCB issued notices of completion of the DPC transactions with respect to its direct loans to Citizens and Lowery. The DPC transactions with respect to minority shareholders, however, were placed "on hold" pending further advice from TCB's regulatory attorneys and the firms that were trying to assist TCB in raising additional capital. Sufficient capital was not raised before the FDIC took over as a receiver.

## II. Analysis

Even though Plaintiff's Complaint is in two counts, the Court only need consider the breach of contract claim because it finds that claim dispositive. This conclusion necessarily makes many of the facts on which Defendant relies, such as his relationship with Lowery and past favorable results in heeding Lowery's entreaties, the reasons Defendant decided to sign the note, and what Defendant expected to occur, largely irrelevant. Those facts are also pretty much immaterial in light of the D'Oench doctrine (from D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447 (1942)) and the codification of that doctrine in 12 U.S.C. § 1823(e).

Federal law, specifically 12 U.S.C. § 1821(d)(2)(A), "places the FDIC in the shoes of the insolvent [bank or savings and Loan association] to work out its claims under state law, except where some provision in the framework of FIRREA [the Financial Institutions Reform, Recovery and Enforcement Act] of 1989 provides otherwise." O'Melveny & Myers v. FDIC, 512 U.S. 79,

86 (1994). Here, the Note states that it to be governed by Tennessee law.

Under Tennessee law, a plaintiff who alleges a breach of contract must prove "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." BancorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006). The "cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." Christenberry v. Tipton, 160 S.W.3d 487, 494 (Tenn. 2005).

In this case, Defendant does not argue that the Note is not a contract or that it is ambiguous. Nor does he argue that he complied with the terms of the Note by making payments when due. Rather, he argues that, for several reasons, TCB had no right to enforce the Note because it was not one of its assets and, perforce, the FDIC-R, as receiver, has no such right.[7]

Defendant first argues that the Note was never negotiated to TCB and the mere fact that it was in the possession of TCB when the FDIC took over as receiver of that failed institution does not make it a holder. In support, he relies on FDIC v. Houde, 90 F.3d 600 (1st Cir. 1996) which held that the FDIC int that case was not entitled to any presumption that it could enforce a promissory note merely because it possessesed the original note. More specifically, the First Circuit held that the FDIC was "plainly not a 'holder; under [state] law because the note was not indorsed to the FDIC and therefore was not 'negotiated.'" Id. at 605. However, that case, as with all cases, must be read in context.

In Houde, the FDIC brought suit in its capacity as receiver for the New Maine National Bank ("NMNB") which was a bridge bank set up by the FDIC following the failure of the Maine National Bank ("MNB"). Even though the FDIC produced the original note on which it sued, the First Circuit held that it was incumbent upon the FDIC to establish a proper transfer of the "note to it in its suing capacity (receiver

---

[7] Pursuant 28 U.S.C. § 1821(d)(2)(A), the FDIC-R "as conservator or receiver and by operation of law, succeed to – (I) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution."

9

of NMNB) from the Note's holder, MNB," observing that

> this transfer could rather easily have been established given the provisions of FIRREA. A transfer of all the holder's (MNB's) rights in the Note to the FDIC as receiver for MNB could be demonstrated simply by showing that the FDIC became the receiver of MNB. Once a receivership of a failed bank takes place, the transfer of the failed bank's assets to the FDIC occurs by operation of law.

Id. at 606. While the question in Houde was " what additional proof is needed to prove that enforceable title to the Note was transmitted to the FDIC in its subsequent and present capacity as *receiver of the bridge bank, NMNB,*" the First Circuit reiterated that " if the FDIC were suing in the capacity of receiver of MNB, nothing more would be required than a showing of such receivership, coupled with a production of the Note, for the FDIC to become entitled to the presumption that it was entitled to payment." Id. (emphasis in original). Here, of course, the FDIC is suing in its capacity as receiver for TCB, not a bridge bank and it is therefore entitled to the presumption that it is entitled to payment.

Defendant next argues that "[i]n order for a person to become the holder of a negotiable instrument, it must be negotiated to that person," and that "'[w]hen an instrument is payable to an identified person, '. . . negotiation requires transfer of possession of the instrument and its endorsement by the holder." (Docket No. 45 at 17 (quoting Tenn. Code Ann. § 47-3-201(b)). Because the Note in this case was payable to Citizens and not endorsed by a signature on the front or back of the note as required by Tenn. Code Ann. § 47-3-204(a), Defendant argues "TCB never became a holder of the Myers Note, hence neither did its receiver, the FDIC." (Id.). This remains so, he insists, even though Lowery, as chairman of Citizens, executed a number of allonges, including one referencing the Note at issue here, because no allonge was ever attached to the Note.

Leaving aside for the moment the Assignment that transferred the Note to TCB, the Court need not reinvent the wheel in relation to these arguments because in Ashmore (which Defendant concedes to be a "related case" and one that presents the "same issue" regarding promissory notes that came into the

FDIC's possession under "virtually identical" circumstances)[8] Judge Nixon rejected virtually the same argument, writing:

> "[A] promissory note is a negotiable instrument, unless it contains a conspicuous statement that it is not negotiable." Thompson v. Bank of Am., N.A., 773 F.3d 741, 749 (6th Cir. 2014) (citing Tenn. Code Ann. § 47-3-104). "'Endorsement' means a signature . . . made on an instrument for the purpose of . . . negotiating the instrument." Tenn. Code Ann. § 47-3-204(a). "For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument." Id. Ashmore asserts that the Allonge executed by Citizens was not affixed to the Note and, therefore, does not constitute an effective endorsement. (Doc. No. 50 at 12.) Although FDIC-R generally contends that the endorsement was valid (Doc. No. 55 ¶ 20), it points to no record evidence to show that the Allonge was affixed as required (see id. ¶ 6).
>
> Even assuming the failure to affix the Allonge to the Note, as the Court must in reviewing FDIC-R's Motion, the lack of a valid endorsement does not defeat FDIC-R's claim. "[U]nder Tennessee law, the fact that the Note itself was not endorsed does not preclude [FDICR] from having the right to enforce it." Donaldson v. BAC Home Loans Servicing, L.P., 813 F. Supp. 2d 885, 895 (M.D. Tenn. 2011). In fact, "[a] person may be … entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument." Tenn. Code Ann. § 47-3-301. This is because, as the Uniform Commercial Code ("UCC") Comments to this chapter explain, "[t]he right to enforce an instrument and ownership of the instrument are two different concepts." Tenn. Code Ann. § 47- 3-203 cmt. 1. Although "negotiation requires transfer of possession of the instrument and its indorsement by the holder," Tenn. Code Ann. § 47-3-201(b), "[t]ransfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument." Tenn. Code Ann. § 47-3-203(b).

---

[8] Defendant made those observation in support of his initial request for a hearing. (Docket No. 47 at 1). Now that Judge Nixon has ruled in favor of the FDIC-R in Ashmore, Defendant has amended his request for hearing, arguing that he "does not believe that any of Judge Nixon's findings or conclusion in the Ashmore Order should be taken by this Court as binding or even as persuasive" . . . because the records compiled in the two cases are substantively different in material ways, both as to the evidence adduced and the legal authorities relied upon." (Docket No. 80 at 3). While the records compiled in the two cases may be different, on the record presented in this case, the Court finds summary judgment in favor of the FDIC-R appropriate. The Court also find that oral arguments would not be helpful in deciding this case and will therefore deny Defendant's requests for a hearing.

11

Ashmore, Slip op. at 6-7). The Court agree with the foregoing rationale.[9]

Defendant's heavy reliance on the supposed intent of the parties (as evidenced primarily by Lowery's testimony and declaration) runs headlong into the D'Oench doctrine and its statutory codification. It also violates the parol evidence rule.

D'Oench involved a situation where, after the FDIC sought to collect on a demand note held by an insolvent bank, the bond salesman objected, claiming that the bank had promised him that it would not seek to collect on the note. The Supreme Court rejected reliance on undocumented agreements given the "federal policy to protect [the FDIC] and the public funds which administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." 315 U.S. at 459. Thus, under the D'Oench doctrine, "a debtor is estopped from asserting any defense based on an unwritten 'side agreement' between the debtor and the original lender that would alter the terms of a debtor's note." Nat'l Enterprises, Inc. v. Smith, 114 F.3d 561, 564 (6th Cir. 1997).

"Congress substantially codified the D'Oench doctrine in section 13(e) of the Federal Deposit Insurance Act of 1950, 64 Stat. 873, 778, 12 U.S.C. § 1823(e)." Commercial Law Corp. v. FDIC, 777 F.3d 324, 328 (6th Cir. 2015). So far as relevant, that statute provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
>
>     (A) is in writing,
>
>     (B) was executed by the depository institution and any person

---

[9] The Court notes that Judge Nixon's ruling is subject to a limited motion to reconsider on a different issue, albeit one that is also present here. Regardless of the outcome of the motion, the Court finds summary judgment in this case to be appropriate.

> claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e)(1).

The D'Oench doctrine and corresponding statutory requirements serve the salutary purpose of "allow[ing] federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets" which becomes particularly important "when the FDIC is deciding whether to liquidate a failed bank . . . or to provide financing for purchase of its assets . . . by another bank," as those decisions "must be made 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.'" Langley v. Fed. Deposit Ins. Corp., 484 U.S. 86, 91 (1987) (quoting Gunter v. Hutcheson, 674 F.2d 862, 865 (11th Cir. 1982). They also "ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure." Id. at 92.

In this case, Defendant points to no writing signed by him or Citizens that relieved him of his obligations under the Note, let alone a writing that was approved by the board of directors or loan committee. Even the LOI on which he partially relies was not signed by him. When the FDIC became the receiver, the signed Note was in the possession of TCB. Moreover, the FDIC found a copy of the Transfer Agreement signed by Citizens and TCB in which Citizens agreed to transfer, assign, and convey of its rights, title and interest in the Note to TCB, including the immediate right

13

to collect and pursue enforcement of the Note. Among the Allonges to the Transfer Agreement was one that stated:

> ALLONGE TO THAT CERTAIN PROMISSORY NOTE IN THE PRINCIPAL AMOUNT OF $5,875,000.00, DATED NOVEMBER 30, 2009, EXECUTED BY DAVID S. MYERS, AS MAKER, IN FAVOR OF CITIZENS CORPORATION
>
> Pay to the order of TENNESSEE COMMERCE BANK, a Tennessee state banking corporation ("TCB"); without recourse, and without representations and without warranties, express or implied, except as may be set forth in that certain Transfer, Assignment and Assumption Agreement by and between the undersigned and TCB of even date herewith.

(Docket No. 52-2 at 19).

Notwithstanding the possession of the Note and the Transfer Assignment, and not withstanding the language in the latter and the allonge, Defendant insists that Plaintiff has not established that it is an entity entitled to enforce the Note because it has not shown that it has met the requirements of Tenn. Code Ann. § 47-3-203(a). That statutory provision states that "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." (Docket No. 45 at 19). Defendant argues:

> [T]he Myers Note was not delivered to TCB for the purpose of giving the right to enforce the Note, except in the following limited sense: the Assignment was executed for the sole and limited purpose of enabling TCB to perform the LOI Transactions . . . as respects the Minority Shareholder Loans. As things developed, however, TCB abandoned its intention to enter into the LOI Transactions with the Minority Shareholders, hence the Assignment never became binding, effective or enforceable. The FDIC's lack of knowledge relevant to these issues disables it from disputing the facts set forth hereinafter and carrying its burden of proof under Tenn. Code Ann. § 47-3-203.

(Id. at 20).

The problem with this argument is it ignores the language of the Transfer Assignment.[10] As this Court has already noted: Paragraph 2 states that Citizens "transfers, assigns and conveys" to TCB "all of Assignor's right, title and interest in, to and under the Loans, Notes and Loan Documents, including, without limitation, all Administrative Agent Rights under the Participation Certificates or otherwise, and any and all interests of Assignor in any of the collateral and/or security provided for the Loans"; Paragraph 3 states that "to induce" acceptance of the transfer, Citizens via Lowery covenants and warrants that he has the requisite authority to execute and deliver the Transfer agreement and assigned interest and documents; and Paragraph 4 states that TCB assumes all of Citizens rights title and interest including the immediate right to enforce the documents in its sole discretion.

In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 889-90 (Tenn. 2002). "Where the language of a contract is clear and unambiguous, its literal meaning controls the outcome of the dispute." Hood v. Jenkins, 2012 WL 4788636 at *7 (Tenn. Ct. App. Oct. 9, 2012).

In the Court's opinion, the language of the Transfer Assignment is clear, and, under Tennessee law, it is controlling. Even apart from the paragraphs of the Agreement just mentioned, the Recitals confirm that Citizen originated the loans and notes (Defendant's and the other minority

---

[10] It also ignores the bankruptcy proceedings involving Citizens in which Citizens, via Lowery, certified under oath that Citizens had no interest in the Note, and the Bankruptcy Court finding (affirmed on appeal) that Citizens conveyed all of its rights and interest in the Note to TCB. More importantly, it ignores Defendant's answer to the trustee's Adversary Complaint seeking to recover interest payments that Citizens had paid under the Note. There, Defendant asserted that "[o]n or about August 11, 2011, Citizens conveyed all of its remaining right, title, and interest in, or under the Instrument to Tennessee Commerce Bank . . . which then held a participation certificated representing about 90% of the instrument[.]" (Docket No. 72-14 at 7).

shareholder's) and that it "desir[ed] to transfer, assign, and delegate" all of its "remaining right, title, and interest" in them to TCB. (Docket No. 1-4 at 1).

Defendant argues that construing the Transfer Agreement as, well, a transfer agreement, without consideration of the fact that the parties envisioned the signing of letters of intent related to the DCB, effectively ignores Paragraph 5. It also ignores Lowery's Declaration and deposition testimony.

But Paragraph 5 merely states that

> Assignee and Assignor hereby covenant and agree to execute and deliver such other documents and instruments, and take such other action, as either party may reasonably request in connection with the transaction contemplated by this Agreement, including the delivery by Assignor to Assignees, within ten (10) days from the date of this Agreement, of the original Loan Documents hereby assigned, including, without limitation, the Notes endorsed to Assignee and any notice or other documents or instruments, which may be required in order to effect the purpose of this agreement the purposes of this Agreement.

(Docket No. 1-4 ¶ 5). On the face of the document, the "transaction contemplated by this agreement" was the transfer of the Notes to TCB. Nowhere is it suggested that its terms were dependent on Defendant's approval or the signing of a LOI related to the DPC.[11]

As noted, to support his position regarding the circumstances surrounding the Assignment, Defendant necessarily relies on extraneous evidence, primarily in the form of the Lowery's deposition testimony and declaration. However, "[i]t is well settled in Tennessee that where the terms of an agreement are unambiguous, the parol evidence rule bars extraneous evidence used 'to alter, vary, or qualify the plain meaning of an unambiguous written contract.'" Battery All. Inc. v.

---

[11] In any event, it would not appear that the LOI gets Defendant very far because, not only did he not sign it, the letter states that it is a summary of general discussions regarding the DPC transaction and that "[t]his Letter of Intent shall not bind TCB to close the DPC transaction in any manner." (Docket No. 41-1 at 3).

T & L Sales Inc., 2015 WL 6873202, at *5 (Tenn. Ct. App. Nov. 9, 2015) (quoting Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co., 160 S.W.3d 521, 525 (Tenn. 2005)). "'[T]he parol evidence rule serves to secure the integrity of contracts and to guard against fraud by a party who agrees to the unambiguous terms of a written agreement and then seeks to disavow those terms through extrinsic evidence.'" Id. (quoting Textron Fin. Corp. v. Powell, 2002 WL 31249913, at *4 (Tenn. Ct. App. Oct. 8, 2002)).

On this issue, the Court again agrees with Judge Nixon's observations in Ashmore. After quoting Adkins v. Bluegrass Estates, Inc., 360 S.W. 3d 404, 412 (Tenn. Ct. App. 2011) for the proposition that "the parol evidence rule does not prohibit the court from considering the circumstances surrounding the formation of the contract, the business to which it relates, and the construction placed upon the contract by the parties in carrying it out," Judge Nixon wrote:

> Ashmore argues that consideration of Lowery's declaration as to the purpose of the Assignment does not violate the parol evidence rule because it does not "alter, vary, or qualify" the meaning of the Assignment. Rather, the Assignment expressly refers to "the transaction contemplated by this Agreement"—the LOI—and Lowery's account is therefore consistent with the terms of the Assignment. Ashmore further argues that the parol evidence rule is not properly implicated under these facts because Lowery's declaration merely serves to identify the contract itself—namely, the unified agreement set out in the Assignment and LOI—not to address any specific terms of that contract. (Doc. No. 59 at 6–7.)
>
> The Court finds that consideration of the assertions made in Lowery's declaration would, indeed, constitute a violation of the parol evidence rule. The Assignment is unambiguous. . . . To introduce into the Assignment the condition that delivery and transfer of the right to enforce the Note require the consummation of the DPC transaction as to Ashmore unquestionably alters, varies, and qualifies the meaning of the Assignment. The purposes of the Assignment are set out in its Recitals, which state in part: "Assignor now desires to transfer, assign and delegate to Assignee, and Assignee desires to assume, all of Assignor's remaining right, title and interest in and to the Notes, Loans and the other Loan Documents," but nowhere discuss this transfer as an instrument drawn up solely for the purpose of effecting the DPC transaction. (Doc. No. 29-7 at 1.) It further states that "Assigner has all requisite authority to execute and deliver this Agreement and to deliver the Assigned Interests

17

and Documents to Assignee." (Id. at 2.) For Ashmore, via Lowery's declaration, to claim that delivery of his Note to TCB was only authorized upon completion of the DPC transaction contradicts the terms of the Assignment.

Ashmore, Slip op. at 10-11.

When it took over as receiver, the FDIC-R was entitled to rely on TCB's records. Those records included the Note to Citizens and the transfer of that Note to TCB, without any written documentation to the contrary. The FDIC is entitled to collect on that Note.

In deciding that summary judgment in favor of the FDIC-R is appropriate, the Court has not forgotten Defendant's Motion to Exclude or Disregard Portions of the Affidavit of Oscar A. Escamilla. In that motion, Defendant asserts that Paragraphs, 2-5, 7-13 and 16-23 should be stricken or ignored because the "statements contained therein are in some cases not facts but ultimate or conclusory facts and conclusions of law, and in other cases are not made on the affiant's personal knowledge, and the Affidavit otherwise fails to demonstrate that the affiant is competent to testify as to the stated matters." (Docket No. 68 at 1). However, this Court's conclusion that the FDIC-R is entitled to judgment is based on the Note which Defendant acknowledges that he signed, and on the Transfer Agreement (together with an allonge that referenced the Note) which Defendant admits that Lowery signed on behalf of Citizens. While Defendant challenges the implications of the Transfer Agreement and its validity, the Court has made that determination based on the document's language and the law, not on Escamilla's assertions.

That leaves the question of damages. "'The purpose of assessing damages in a breach of contract suit is to place the plaintiff, as nearly as possible, in the same position he would have had if the contract had been performed.'" BancorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 228 (Tenn. Ct. App. 2006). Because the FDIC-R is the successor in interest to TCB is has the right to

recover damages in TCB's stead. See, 12 U.S.C. 1821(d)(2)(A)

Pursuant to the terms of the Note, Defendant was obligated to pay $5.875 million with interest accruing at a minimum rate of 5.75% per annum. He admits that he has made no payments on the principal. According to the FDIC-R, the total indebtedness owed by Defendant as of the filing of the its Motion for Judgment on April 15, 2015 was $7,041,097.25, to which it is entitled to additional daily interest in the amount of $925.5137 until the date of judgment. While those figures are derived from calculations made by Escamilla which Defendant challenges as not being based on personal knowledge, "[t]he calculation of interest is a mechanical task." FDIC v. Armstrong, 784 F.2d 741, 745 (6th Cir. 1986). Based on the terms of the Note, the FDIC-R is entitled to judgment in the principal amount of $5,875,000.00 plus interest in the amount of $1,471,566.78 for a total of $7,346,566.78.[12]

### III. Conclusion

On the basis of the foregoing, summary judgment will be granted in favor of the FDIC-R and it will be awarded $7,346,566.78. Defendant's cross-motion for summary judgment will be denied, as will his motions for hearing and motion to strike or exclude Escamilla's affidavit.

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[12] The Note sets the minimum interest rate at 5.75% per annum, meaning that the daily interest rate is $925.5137 ($5,875,000 x 5.75 = 3,378,125 ÷ 365 = $925.5137). The number of days from November 2, 2011 (when Defendant stopped making required payments) through March 10, 2016, is 1590 making the total interest owed $1,471,566.78 (1,590 x 925.5137).